**Docket No. 23-1269, 2023-1271**

---

**United States Court of Appeals
for the Federal Circuit**

---

**STYLWAN IP HOLDING, LLC, STYLWAN, INC., STYLWAN IIT, LLC,**

*Plaintiffs – Appellants*

**v.**

**STRESS ENGINEERING SERVICES, INC.**

*Defendant – Cross-Appellant*

---

**Appeal from The United States District Court for the Southern District of Texas in No. 4:20-cv-03297 before The Honorable Keith P. Ellison**

---

**REPLY AND RESPONSE BRIEF OF *Plaintiff–Appellant*
STYLWAN IP HOLDING, LLC, STYLWAN, INC., STYLWAN IIT, LLC**

Attorneys for Appellants:

Ramey LLP

/s/ William P. Ramey, III
William P. Ramey, III
Texas Bar No. 24027643
wramey@rameyfirm.com
5020 Montrose Blvd., Suite 800
Houston, Texas 77006
(713) 426-3923
(832) 900-4941 (fax)

i

# CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4(a) and Federal Rule of Appellate Procedure 26.1, counsel for Appellants Stylwan IP Holding, LLC and Stylwan IIT, LLC (collectively, "Stylwan") certifies the following:

1. The full name of every party represented by the undersigned is Stylwan IP Holding, LLC and Stylwan IIT, LLC.

2. The real party in interest is Stylwan IP Holding, LLC and Stylwan IIT, LLC.

3. Stylwan IP Holding, LLC has no parent corporation and there is no publicly held corporation that owns 10% or more of the stock of either corporation.

4.  Stylwan, Inc. has no parent corporation and there is no publicly held corporation that owns 10% or more of the stock of either corporation.

5.  Stylwan IIT, LLC has no parent corporation and there is no publicly held corporation that owns 10% or more of the stock of either corporation.

4. The names of all law firms and the partners or associates that appeared for any of Stylwan IP Holding, LLC or Stylwan IIT, LLC in the district court or are expected to appear in this Court are:

William P. Ramey, III
Donald H. Mahoney III
Kyril Talanov
Ramey LLP

Peter Corcoran
Corcoran IP

5.     The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. See Fed. Cir. R. 47. 4(a)(5) and 47.5(b).

6.     None.

Date:  December 20, 2023                    /s/ William P. Ramey, III
                                            William P. Ramey, III

# TABLE OF CONTENTS

REPLY ARGUMENT ................................................................................5

I.    THE DISTRICT COURT'S DIVERSION FROM THE PLAIN AND
      ORDINARY MEANING CANNOT BE SUPPORTED ......................5

II.   THE DOCTRINE OF CLAIM DIFFERENTIATION ILLUSTRATES
      THE DISTRICT COURT IMPROPERLY INCORPORATED
      LIMITATIONS FROM THE SPECIFICATION ................................5

      A.    Incorporating Autonomous Into the Construction Would
            Render Many Claims Meaningless ...............................................6

      B.    Incorporating the Identifier Equations Revisits the Cardinal
            Sin ...............................................................................................8

      C.    Appellee's Brief Solidifies Stylwan's Argument that there is No
            Disclaimer ..................................................................................11

      D.    Counsel's Argument During Markman Explained that Partially
            manual Operations are Within the Scope of the Invention.......12

      E.    Stylwan's Arguments in the '038 Application are Limited to
            that Invention  ............................................................................13

III.  THE DISTRICT COURT ERRED BY INCORPORATING
      LIMITATIONS FROM THE SPECIFICATION FOR
      SIGNAL/SENSOR ELEMENTS.......................................................14

      A.    The Words "Induced Magnetic Field" are Not in the Asserted
            Claims but Rather is a Limitation from Appellee's Opening
            Markman Brief.........................................................................14

      B.    Appellee Does Not Address the other Signal/Sensors Disclosed
            in the specifications of the Patents-in-Suit ...............................15

      C.    There is No Clear Disavowal of Claim Scope in the Prosecution
            History of the Patents-in-Suit....................................................22

D.   SES's Expert Testimony is Improper to Contradict the Plain Meaning of the Patent Specification ......................................... 26

IV.   THE CLAIMS OF THE PATENTS-IN-SUIT ARE PATENTABLE 26

A.   The District Court was Correct that there are Unresolved factual Issues that Preclude Dismissal .................................................. 27

B.   Claim 1 of Each Patent is Not Representative .......................... 32

1.   Claim 1 Of The '320 Patent Is Patent Eligible And Valid .. 32

2.   Claim 1 Of The '871 Patent Is Patent Eligible And Valid .. 35

3.   Claim 1 of the '874 Patent Is Patent Eligible And Valid .... 37

4.   Claim 37 Of The '425 Patent Is Patent Eligible And Valid 40

5.   Claim 41 of the '910 Patent Is Patent Eligible And Valid .. 44

6.   Claim 1 Of The '894 Patent Is Patent Eligible And Valid .. 50

C.   Alternatively, Stylwan Should Be Permitted To Amend Its Complaint With Additional Claims .......................................... 55

CONCLUSION AND RELIEF SOUGHT ............................................................ 57

## TABLE OF AUTHORITIES

**Cases**

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014)...........................47

*Athena Diagnostics, Inc. v. May Collaborative Servs., LLC*, 915 F.3d 743 (Fed. Cir. 2019) ................................................................................44

*BASCOM Global Internate Servs. v. AT&T Mobility LLC*, 827 F.3d 1341 (Fed. Cir. 2016) ................................................................................50

*Berkheimer v. HP Inc.*, 881 F.3d 1360 (Fed. Cir. 2018) ........................................37

*Blackbird Tech LLC v. Advanced Discovery Inc.*, No. 16-413-GMS, 2017 U.S. Dist. LEXIS 98045 (D. Del. June 26, 2017)......................................................32

*Cap-XX, Ltd. v. Ioxus, Inc.*, No. 18-849-CFC, 2020 U.S. Dist. LEXIS 35282 (D. Del. Mar. 2, 2020) ................................................................................50

*Customedia Techs., LLC v. Dish Network Corp.*, 951 F.3d 1359 (Fed. Cir. 2020) ......................................................................... 44, 49

*DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014).............48

*Diamond v. Diehr*, 450 U.S. 175 n.12 (1981)........................................................47

*Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016).... 42, 46, 49

*Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327 (Fed. Cir. 2016) ............. 37, 47, 50

*Ericsson Inc. v. TCL Commun. Tech. Holdings Ltd.*, 955 F.3d 1317 (Fed. Cir.2020) ................................................................................41

*GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304 (Fed. Cir. 2014)............14

*Genedics, LLC v. Meta Co.*, No. 17-1062-CJB, 2018 U.S. Dist. LEXIS 7845 (D. Del. Jan. 8, 2018)................................................................... 36, 48

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*, No. PWG-14-111, 2015 U.S. Dist. LEXIS 62601 (D. Md. May 12, 2015)...............................................32

*Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307 (Fed. Cir. 2016)................................................................ 42, 44, 46

*Karlin Tech. Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968 (Fed.Cir.1999) ...........6

*Liebel–Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898 (Fed.Cir.2004)......................6

*Magna Elecs., Inc. v. Valeo, Inc.*, No. 13-11376, 2017 U.S. Dist. LEXIS (E.D. Mich. Apr. 10, 2017) ................................................................................. 38, 39

*Mayo*, 566 U.S. at 89-90 ........................................................................................35

*McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299 (Fed. Cir. 2016) .......................................................................... 51, 52

*Pacing Techs., LLC v. Garmin Int'l, Inc., 778 F.3d 1021 (Fed. Cir. 2015)* ............*10*

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ............................. 8, 15, 26

*Rapid Litig. Mgmt. v. CellzDirect, Inc.*, 827 F.3d 1042 (Fed. Cir. 2016) ........ 39, 47

*Sci. Applications Int'l Corp. v. United States*, 154 Fed. Cl. 594 (2021), *reconsideration denied*, 161 Fed. Cl. 373 (2022)................................................26

*Thales Visionix, Inc. v. United States*, 850 F.3d 1343 (Fed. Cir. 2017) ........... 38, 41

Thorner v. Sony Computer Entm't Am. LLC, 669 F.3d 1362 (Fed.Cir.2012) ..........5

*TLI Communs. LLC v.AV Auto., L.L.C.*, 823 F.3d 607 (Fed. Cir. 2016) .......... 39, 50

**Constitutional Provisions & Statutes**

35 U.S.C. § 101 .......................................................................................................28

**Rules & Regulations**

Fed. R. App. P. 26.1 ................................................................................................. ii

Fed. R. App. P. 32 .....................................................................................................2

# TABLE OF ABBREVIATIONS

### *Parties*

| | |
|---|---|
| Plaintiff, Appellant or Stylwan | Stylwan IP Holding, LLC and Stylwan IIT, LLC |
| Defendant, Appellee or SES | Stress Engineering Services, Inc. |

### *Patents-in-Suit*

| | |
|---|---|
| The '320 patent | U.S. Patent No. 7,231,320. |
| The '871 patent | U.S. Patent No. 7,403,871. |
| The '874 patent | U.S. Patent No. 8,050,874. |
| The '425 patent | U.S. Patent No. 8,086,425. |
| The '910 patent | U.S. Patent No. 8,428,910. |
| The '894 patent | U.S. Patent No. 8,831,894. |

### *Defined Terms*

| | |
|---|---|
| District Court | United States District Court for the Southern District of Texas, the Honorable Keith P. Ellison |
| Court of Appeals | United States Court of Appeals for the Federal Circuit |

All emphasis in this brief is added unless otherwise indicated.

## SUMMARY OF ARGUMENT

There are only two exceptions to the plain and ordinary meaning and neither apply in this case. The District Court's claim construction commits the cardinal sin in patent law by incorporating limitations from the specification into the claims. The District Court compounded its error by adopting a construction that uses terms not found in any of the specifications of the Patents-in-Suit and only found in Appellee's briefing.

The District Court ignored clear claim differentiation precedent from this Court in requiring that each claim of the six Patents-in-Suit to perform entirely autonomously, using two identified identifier equations. The District Court overlooked the fact that claims 2, 3, 4, 5, 6, 17, 18, 32 of the '874 patent; claims 2, 3, 4, 5, 6, 33, 36, 41, 42, 43, 44, 45, 48 of the '425 patent; and, claim 27 of the '910 patent each claim manual processes and operator intervention. One of ordinary skill in the art, when confronted with the volumes of disclosure beyond a merely autonomous systems, would not limit the invention.

Likewise, three of the six patents that specifically claim "identifier equations" or "material features recognition equations." Other than those claims, the remainder of the claims of the Patents-in-Suit do not mention or refer to "identifier equations"

1

or "material features recognition equations" and such limitation should not be added as a limitation.

The District Court further erred by incorporating limitations from the specification for the Signal/Sensor claim limitations. The phrase "induced magnetic fields" is not found in the specifications of the Asserted Patents The words were not chosen by patentee and are a classic example of claim redrafting. The District Court construed claim terms with different language than that of the claim (i.e., providing a construction other than "plain and ordinary meaning") and thus redrafted, redefined, and otherwise changed the meaning of the claims.

The District Court's Order denying Cross-Appellant's Motion to Dismiss for claiming ineligible subject matter at the pleading stage was correct.

SES's arguments in its brief ask the Court to draw fact inferences against Stylwan at this pleading stage—which is inappropriate. Appellee's brief asserts without support that the coefficients and identifier equations are well-known. However, the language of the specification of the '874 Patent, for example, contradicts this unsupported, non-factual statement. Further, SES's reference to the finite-element analysis engine as a widely commercially available misses the mark because the relevant inquiry is whether the elements individually ***or as an ordered***

***combination*** "transform the nature of the claim" into a patent-eligible application. That question is a fact issue in dispute precluding dismissal at this stage.

Contrary to the arguments in the Appellee's Brief, the claimed inventions lead to a physical work product, such as a report, by virtue of the working of the ordered combination of claimed elements. While it is true that that the industry has utilized a variety of non-destructive inspection techniques over the last 100 years including magnetic flux leakage, magnetic particles, eddy-current, ultrasonic, radiation, dye penetrant, dimensional, visual, and audible, it is the ordered combination that renders the claims patent eligible.

The binding authority come from *Mayo* and *Alice* which ask:

(1) Whether the claim may be distinguished from those that "claim laws of nature, natural phenomena, and abstract ideas," and

(2) If so, "consider the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application."[1]

The claimed inventions as a whole recites technological, patentable subject matter, and help overcome technological problems. At this stage, this conclusion should end the inquiry. It is premature to resolve inferences against Stylwan, the non-movant, as discovery is still ongoing. Nonetheless, to the extent the Court wishes to

---

[1] *Alice*, 134 S. Ct. at 2355.

consider step two of the *Alice/Mayo* test as applied to the claims of the Patents-in-Suit, these claims identify an "inventive concept" in the application of their respective subject matter.  At a minimum, there are disputed fact issues regarding whether the claims of the Patents-in-Suit involve more than the performance of well-understood, routine, and conventional activities previously known to the industry.  As such, resolution against the non-movant, Stylwan, is inappropriate at this pleading stage.

# REPLY ARGUMENT

## I.  THE DISTRICT COURT'S DIVERSION FROM THE PLAIN AND ORDINARY MEANING CANNOT BE SUPPORTED.

There are only two exceptions to the plain and ordinary meaning and neither apply in this case.  The District Court's claim construction was in error.[2]  Further, Appellee SES's Brief ("Appellee's Brief")  does not provide any justification for the District Court's constructions because it does not identify any explicit definition set out by patentee nor has it identified a clear disavow of claim scope that would apply to each and every claim from the six patents in suit.[3]   Both the Sensor/Signal Limitations and the Program Limitations should be construed according to their plain and ordinary meaning.   Appellee's Brief cherry picks examples from the prosecution history of discrete claims from the six Patents-in-Suit in an attempts to establish disclaimer across all claims, in violation of the basic tenets of patent law. However, the six Patents-in-Suit, while related by priority, do not share a common specification but rather are directed to various different inventions in scope.[4]

## II.  THE DOCTRINE OF CLAIM DIFFERENTIATION ILLUSTRATES THE DISTRICT COURT IMPROPERLY INCORPORATED LIMITATIONS FROM THE SPECIFICATION

---

[2] Appx0016; Appx0017-Appx0018.

[3] *Thorner v. Sony Computer Entm't Am. LLC,* 669 F.3d 1362, 1365 (Fed.Cir.2012).

[4] *Compare* Appx0019-Appx0040 with Appx0041 – Appx0063 with Appx0064 – Appx0109 with Appx0110 – Appx0155 with Appx0156 – Appx0200 with Appx0201 – Appx0251.

To support the District Court's constructions, SES argues that the specification limits the claims to autonomous systems utilizing identifier equations.[5] However, SES never addresses the doctrine of claim differentiation. "The doctrine of claim differentiation stems from 'the common sense notion that different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope.'"[6] This Court has stated the doctrine is at its strongest "where the limitation sought to be 'read into' an independent claim already appears in a dependent claim."[7] Likewise, there is a presumption that two independent claims have different scope when different words or phrases are used in those claims.[8] Understandably, the doctrine "only creates a presumption that each claim in a patent has a different scope; it is not a hard and fast rule of construction."[9] However, here, there is no clear disclaimer that limits the scope of the claims and preclude the application of claim differentiation.

### A.    Incorporating Autonomous Into the Construction Would Render Many Claims Meaningless

There simply is no requirement that the multiple claimed systems are

---

[5] Appellee's Brief at 6-8.

[6] *Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1368–69 (Fed. Cir. 2005) c*iting Karlin Tech. Inc. v. Surgical Dynamics, Inc.,* 177 F.3d 968, 971–72 (Fed.Cir.1999).

[7] *Liebel–Flarsheim Co. v. Medrad, Inc.,* 358 F.3d 898, 910 (Fed.Cir.2004).

[8] *Seachange Int'l, Inc.*, 413 F.3d at 1368–69.

[9] *See id.*

6

autonomous.  In fact, the Patents-in-Suit specifically claim manual processes and operator intervention, for example in claims 2, 3, 4, 5, 6, 17, 18, 32 of the '874 patent; claims 2, 3, 4, 5, 6, 33, 36, 41, 42, 43, 44, 45, 48 of the '425 patent; and, claim 27 of the '910 patent.[10]  Further, the Figures disclose embodiments with manual processes, including speech and visual display of inspection data,[11] and operator control of cameras,[12] experts in remote locations monitoring sensors,[13] operators monitoring sensors[14] operators for entering data,[15] and operators for AutoRule.[16]  Thus, incorporating 'autonomous' into a construction of the claims would necessarily limit the construction to one of many disclosed embodiments and run afoul of the canon of claim construction, a cardinal sin to avoid, that embodiments are not to be read into the claims.[17]

Appellee's Brief goes to great lengths to point to discrete references to

---

[10] Appx0106 – Appx0107 at claims 2,3,4,5,6,17,18,32; Appx0151 – Appx0154 at claims 2,3,4,5,6,33,36,41,42,43,44,45,48 32:45-50; Appx0198 at claim 27.

[11] Appx0020 at Fig. 1; Appx0043 at Fig. 1; Appx0069 at Fig. 4; Appx0115 at Fig. 4; Appx0161 at Fig. 4; and, Appx0208 at Fig. 4.

[12] Appx0137 at 13:43-53; Appx0201 at 12:55-65.

[13] Appx0137 at 13:63-66.

[14] Appx0149 at 40:12-15; 48-50; Appx0201 at 38:10-13.

[15] Appx0239 at 27:13-17.

[16] Appx0247 at 43:40-45.

[17] *Intellicheck Mobilisa, Inc. v. Wizz Sys., LLC*, 173 F. Supp. 3d 1085, 1090 (W.D. Wash. 2016).

autonomous.  However, as detailed in Appellant's Principal Brief,[18] there are

numerous detailed examples of manual systems as well as partially manual

systems.  Appellee's Brief does not address any of this language, any of this

disclosure.  It is fundamental that a skilled artisan would look to the entire

disclosures of a patent in determining what is disclosed.[19]  As this Court has

stated:

> It is the person of ordinary skill in the field of the invention through
> whose eyes the claims are construed. Such person is deemed to read
> the words used in the patent documents with an understanding of their
> meaning in the field, and to have knowledge of any special meaning
> and usage in the field. The inventor's words that are used to describe
> the invention—the inventor's lexicography—must be understood and
> interpreted by the court as they would be understood and interpreted
> by a person in that field of technology....[20]

Here, one of ordinary skill in the art would be confronted with volumes of

disclosure beyond a merely autonomous systems and therefore would not limit the

invention.  Further, given that the claims do not use the word autonomous, it

should not be part of any construction.

**B.    Incorporating the Identifier Equations Revisits the Cardinal Sin**

The District Court erred by incorporating the identifier equations into its

construction.  There are claims in three of the six patents that specifically claim

---

[18] Appellant's Corrected Brief at 28-40.
[19] *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005).
[20] *See id.*

"identifier equations" or "material features recognition equations."[21]   Other than

those claims, the remainder of the claims  of the Patents-in-Suit do not mention or

refer to "identifier equations" or "material features recognition equations" and such

limitation should not be added.   However, the District Court's construction

incorporated the three specifically identified identifier equations into every claim.[22]

Given the breadth of the disclosure and the various identifier equations that could

be used, it was error for the District Court to limit the claimed equations

specifically to the three specifically identified identifier equations.[23]

The fact that the terms "identifier equations" and "material features

recognition equations" are not a limitation in a claim of some of the Patents-in-Suit

establishes a rebuttable presumption that the term should not be included in the

claims that do not mention the term "identifier equations" or "material features

recognition equations."[24]   Nowhere does patentee provide that the identified

equations are the only mathematical formula that would work. In fact, patentee

provides that "[i]t should be understood that a number of identifier equations may

---

[21] Appx0106 at 43:62-63 (Claims 1-38 of the '874 patent) and Appx0151 at 42:29-32 (claims 1-36 of the '425 patent).

[22] Appx0017-Appx0018; Appx0016.

[23] Appx0106 at 43:62-63 (Claims 1-38 of the '874 patent) and Appx0151 at 42:29-32 (claims 1-36 of the '425 patent).

[24] *Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1368 (Fed. Cir. 2005).

be paralleled and/or cascaded, each one utilizing a different set of optimal mutual features."[25] Thus, the written description provides for other identifier equations.

As previously discussed, *Pacing Techs., LLC v. Garmin Int'l, Inc.*[26] is distinguishable as the patentee in that case made clear that each feature was a required feature of the claimed invention. Here, the patentee specifies that other identifier equations can be used with other variables, coefficients and constants.[27] Further, the *Pacer Techs* case cited by Appellee provides that "[t]he characterization of a feature as 'an object' or 'another object,' or even as a 'principal object,' will not always rise to the level of disclaimer.[28] Thus, Appellee's cited case does not establish disclaimer.

While Stylwan did use references to "the invention" and "the present invention.," those references were with respect to certain claims and not to be construed as a broad disclaimer of the scope of the disclosed invention, but rather a differentiation for that particular claim. For example, it is not surprising that Stylwan referred to "the present invention" with reference to Claim 1 of the

---

[25] Appx0034 at 10:41-44; Appx0057 at 10:22-24; Appx0097 at 25:45-47; Appx0143 at 25:40-42; Appx0189 at 25:55-57; and, Appx0238 at 25:55-57.
[26] 778 F.3d 1021, 1024-5 (Fed. Cir. 2015).
[27] Appx0034 at 10:41-44; Appx0057 at 10:22-24; Appx0097 at 25:45-47; Appx0143 at 25:40-42; Appx0189 at 25:55-57; and, Appx0238 at 25:55-57.
[28] *Pacing Techs., LLC*, 778 F.3d at 1025.

application that issued as the '874 patent,[29] as it specifically claims 'identifier

equations.'[30]

### C.    Appellee's Brief Solidifies Stylwan's Argument that there is No Disclaimer

SES goes to great lengths to pull random statements from the many years of

prosecuting the various Patents-in-Suit in an effort to limit the scope of all

claims.[31]  However, in each case, the statement is explaining the prior art as is

shown in each of the 21-line items cited by SES.  Stylwan admits that at the time

of the invention most prior art systems relied entirely on manual operations.

However, simply because at least partially non-manual operated claims are

differentiated over manually operated systems does not mean that the at least

partially manually operated claim are somehow converted to autonomous systems.

Such a result defies logic and runs counter to the understanding of one of ordinary

skill in the art who would be able to review the expansive disclosure in the Patents-

in-Suit and see that many modes of operation are possible, including a fully

automatic mode and a mode utilizing an inspector (an at least partially manual

mode):

---

[29] Appellee's Brief at 19.
[30] Appx0106 at 43:62-63.
[31] Appellee's Brief at 17-19.

> Thus, this application covers unique and novel inspection equipment that recognizes, through three-dimensional signal processing, the nature of the material imperfections automatically and therefore, does "have something meaningful to say" to the material owner directly (and of course to an inspector, if one is present). However, the system does bypass the verification crew and is capable of bypassing the inspector when being used in a fully automatic mode. [32]

Thus, not all operation is fully automatic.[33]

### D.    Counsel's Argument During Markman Explained that Partially manual Operations are Within the Scope of the Invention

SES's cite to a portion of the Markman Hearing Transcript completely misrepresents counsel's statements.[34]

```
          Nobody is claiming that -- plaintiffs are not
suggesting that these claims can be performed by a human all on
their own.  Otherwise it wouldn't be patentable subject matter.
          What we're saying is this idea that I guess we
just turn the system on and it just does everything without any
human interaction is absurd and it's contradicted by the
specification in this case in Figure 1.  We see that there are
items here for interacting with the system. [35]
```

---

[32] Appx2465.
[33] Appellant's Brief at 30-32.
[34] Appellee's Brief at 20.
[35] Appx3038.

SES's counsel specifically provided that it was absurd to think the system worked entirely without human intervention.  There is no disclaimer of a manual system rather an explanation of how the claimed systems work, in reality.

### E. Stylwan's Arguments in the '038 Application are Limited to that Invention

It is not surprising that Stylwan limited the claims of the '038 application to systems that use identifier equations, as that is specifically claimed.[36] A database comprises the 'material feature recognition equations."  Further, there is no requirement that the entire system is autonomous.[37]  Appellee's argument mislead the District Court by not disclosing that each of the Patents-in-Suit include the following language:

> Although specific examples may have been described and disclosed, the invention of the instant application is considered to comprise and is intended to comprise any equivalent structure and may be constructed in many different ways to function and operate in the general manner as explained hereinbefore. Accordingly, it is noted that the embodiments described herein in detail for exemplary purposes are of course subject to many different variations in structure, design, application and methodology. Because many varying and different embodiments may be made within the scope of the inventive concept(s) herein taught, and because many modifications may be made in the embodiment herein detailed in accordance with the descriptive requirements of the law, it is to be understood that the details herein are to be interpreted as illustrative and not in a limiting

---

[36] Appx2478.
[37] Appx2600 at 4.

sense[,][38]

thus showing the expansive nature of the invention and how patentee expressly stated that specification described embodiments are not to be limiting. The patentee, at best, used autonomous to show that the "inspection" is "able to function without external control or intervention," but the "control" of the system is not modified by autonomous. Thus, the entire system need not be autonomous.

## III.    THE DISTRICT COURT ERRED BY INCORPORATING LIMITATIONS FROM THE SPECIFICATION FOR SIGNAL/SENSOR ELEMENTS.

### A. The Words "Induced Magnetic Field" are Not in the Asserted Claims but Rather is a Limitation from Appellee's Opening Markman Brief

The District Court committed the cardinal sin of patent law by incorporating limitations from the specification for the Signal/Sensor Limitations. Appellee's Brief attempts to justify the District Court's error by providing that Stylwan only provided example embodiments using sensors and signals responsive to magnetic fields.[39] However, that statement alone is enough to reverse the District Court as it is improper to limit claims to one disclosed embodiment, absent other factors, none of which are present in this case.[40] It bears repeating that the words "induced

---

[38] Appx0034 at 10:34-51; Appx0062 at 20:4-21; Appx0106 at 43:37-51; Appx0151 at 41:66-42:16; Appx0197 at 42:15-32; and, Appx0247 at 43:46-63.
[39] Appellee's Brief at 26.
[40] *GE Lighting Sols., LLC v. AgiLight, Inc.,* 750 F.3d 1304, 1309 (Fed. Cir. 2014).

magnetic fields" are not found in any of the claims of the Asserted Claims[41] of the Asserted Patents. Further, the words "induced magnetic fields" are not found in the specifications of the Asserted Patents; not in the '320 patent,[42] the '871 patent,[43] the '874 patent,[44] the '425 patent,[45] the '910 patent,[46] or the '894 patent.[47] The words "induced magnetic field" first appear in Appellee SES's Markman Briefing.[48] The words were not chosen by patentee and are a classic example of claim redrafting.

## B. Appellee Does Not Address the other Signal/Sensors Disclosed in the specifications of the Patents-in-Suit

It is fundamental that a skilled artisan would look to the entire disclosures of a patent in determining what is disclosed and not cherry-picked cites.[49] Here, one of ordinary skill in the art would be confronted with volumes of disclosure beyond magnetic sensors and signals and therefore would not limit the invention to magnetic sensors and signals.

---

[41] Appx0039 – Appx0040 at Claims 1, 14; Appx0061 at Claim 1; Appx00106 – Appx0108 at Claims 1, 7-8, 21-25, 30-31, 36, 43, 47; Appx0151 – Appx0154 at Claims 1, 7, 20, 22, 28-29, 37, 44, 46-47, 55; Appx0197 – Appx0199 at Claims 24, 29-34; Appx0247 – Appx0249 at Claims 1, 4-6.
[42] Appx0019 – Appx0040.
[43] Appx0041 – Appx0063.
[44] Appx0064 – Appx0109.
[45] Appx0110 – Appx0155.
[46] Appx0156 – Appx0200.
[47] Appx0201 – Appx0251.
[48] Appx1942 at 15-18.
[49] *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005).

To reiterate the disclosure from Appellant's Brief,[50] the '320 patent discusses a variety of sensors capable of use with varying embodiments of the invention:

> thereof. It should be further understood that camera **19** may comprise more than one camera. Further camera **19** may utilize visible light, infrared light, any other spectrum com-
> 5 ponent, or any combination thereof. The camera **19** may be used to relay an image or a measurement such as a tem-perature measurement, a dimensional measurement, a com-parative measurement, or any combination thereof including information to identify the MUI. It should be appreciated [51]

Further descriptions in the specification of the '320 patent are not limited to any particular type of excitation:

---

[50] Appellant's Brief at 15-25.
[51] Appx0032 at 6:28-32.

material use parameters, and automatically determine the MUI **9** status. Thus, a function of the imperfection detection interface **20** is to generate and induce excitation **21** into the MUI **9** and detect the response, of the MUI **9**, to the excitation **21**. Preferably, at least one inspection head **8** is mounted on or inserted in the MUI **9** and the head **8** may be stationary or travel along the MUI **9**. It should be appreciated that the inspection head **8** can be applied to the inside as well as the outside of the MUI **9**. It should be understood that the inspection head **8**, illustrated herein, may comprise at least one excitation inducer **6** and one or more inspection sensors **7** mounted such that the inspection needs of MUI **9** are substantially covered. For MFL inspection, the excita- [52] and

specifically allow for differing sensors based on the material under investigation ("MUI"):

Computer **10** also controls and monitors a plurality of power supplies, sensors and controls **23** that facilitate the inspection process including but not limited to MUI **9** identification and safety features. Further, computer **10** monitors/controls the data acquisition system **25** which preferably assimilates data from at least one sensor **24**. The sensor **24** preferably provides data such as, but not limited to, MUI **9** location (feet of MUI **9** passing through the inspection head **8**), penetration rate (speed of MUI **9** moving through the inspection head **8**), rate of rotation (rpm), and coupling torque. It should be appreciated that the data to be acquired will vary with the specific type of MUI **9** and thus the same parameters are not always measured/detected. For [53]

---

[52] Appx0033 at 7:54-65.

[53] Appx0033 at 8:30-43.

Likewise, the '871 patent discusses numerous sensors:

> any combination thereof. It should be further understood that camera **19** may comprise more than one camera. Further camera **19** may utilize visible light, infrared light, any other spectrum component, or any combination thereof. The camera **19** may be used to relay an image or a measurement such as a temperature measurement, a dimensional measurement, a comparative measurement, or any combination thereof including information to identify the MUI. It should be appre-[54]

Further disclosure in the '871 patent illustrates the broad nature of the signals associated with the imperfection detection interface.[55] Further disclosure of a sensor illustrates that the sensors can be programmed to perform many tasks.[56] Additional disclosure in the '871 patent provides that the type of sensor and data collected vary with the material under investigation.[57]

Specific further examples of sensors other than ones that respond to an induced magnetic charge are provided in the '874 patent that include visible light, infrared light, and other spectrum components.[58] The '874 patent further discloses sensors to monitor pressure, temperature, loads, vibration and the like.[59]

---

[54] Appx0055 at 6:21-28.
[55] Appx0056 at 7:40-50.
[56] Appx0056 at 7:56-66.
[57] Appx0056 at 8:14-38.
[58] Appx0090 at 12:47-56.
[59] Appx0091 at 13:66-14:4; Appx0094 at 19:55-67; Appx0094 at 20:10-28; Appx0094 at 20:30-34; Appx0096 at 24:12-29; Appx0096 at 24:39-43; Appx0106 at 43:7-27.

The '425 patent discloses the broad nature of signals in the Summary:

> In another possible embodiment, the invention may comprise a sensor with an output comprising of signals indicative of features from the material being scanned, in a time-varying electrical form. A sensor interface may be provided for the [60]

Specific further examples of sensors other than ones that respond to an induced magnetic charge are further provided in the '874 patent that include visible light, infrared light, and other spectrum components.[61]   The '425 patent also discloses sensors to detect sound[62] and pump pressure, external pressure, temperature, flow rate and the like.[63]   Further, the '425 patent makes clear that the signals are not limited to induced magnetic fields.[64]   Likewise, the specification of the '910 patent, which is very similar to the specification of the '425 patent, discloses different sensors:

---

[60] Appx0132 at 4:3-8.
[61] Appx0137 at 13:43-53.
[62] Appx0139 at 17:30-43.
[63] Appx0139 at 18:58-19:18.
[64] Appx0142 at 24:33-40.

19

involved are also required. Typically, the MUA 9 is analyzed under a regiment of anticipated loads that reflect the opinion of experts. A unique feature of AutoFFS is the data acquisition system 35 and sensors 36 and 37. As discussed earlier, computer 20 may also monitor, through the data acquisition system 35, parameters that are related to the assessment or utilization of the MUA 9 and/or parameters to facilitate FFS and/or remaining useful life estimation. Such parameters may include, but not be limited to, the MUA 9 pump pressure, external pressure, such as the wellhead pressure, temperature, flow rate, tension, weight, load distribution, fluid volume and pump rate and the like. Preferably, these parameters are measured or acquired through sensors and/or transducers mounted throughout the MUA 9 deployment area 169, such as a rig or on the MUA 9, such as a vibration monitor. For ease of understanding, these various sensors and transducers are designated with the numeral 37. Therefore, and in addition to [65]

The specification of the '894 patent includes the disclosure of numerous sensors, including:

---

[65] Appx0197 at 41:49:65.

or any combination thereof. It should be further understood that camera **29** may comprise more than one camera. Further camera **29** may utilize visible light, infrared light, any other spectrum component, or any combination thereof. The camera **29** may be used to relay an image or a measurement such as a temperature measurement, a dimensional measurement (such as 3-G of the flaw spectrum), a comparative measurement, character and/or code recognition, such as a serial number, or any combination thereof including information to identify the MUA **9** and/or the authorized operator through biometric recognition. It should be appreciated that the stor-[66]    Further examples of sensors are disclosed for a material identification system,[67] sensors that measure pressure, temperature, flow rate, tension, weight, load distribution fluid volume, pump rate, and the like.[68] One of ordinary skill in the art would look to this broad disclosure to determine what the signal/sensor limitations comprise. There is no reason to deviate from the plain and ordinary meaning.

Construing claim terms with different language than that of the claim (i.e., providing a construction other than "plain and ordinary meaning") runs the risk of redrafting, redefining, or otherwise changing a claim term's meaning. The danger of redrafting or redefining a claim term's meaning is particularly heightened when a proposed construction uses words found nowhere in the patent specification, as is the case here.

---

[66] Appx0231 at 12:55-65.
[67] Appx0232 at 13:56-66; Appx0232 at 14:8-13.
[68] Appx0235 at 19:4-17; Appx0235 at 19:20-31.

### C. There is No Clear Disavowal of Claim Scope in the Prosecution History of the Patents-in-Suit

Appellee's Brief points to no clear disavowal of claim scope.[69]  At best, SES illustrates there are multiple embodiments disclosed in the Patents-in-Suit.  SES's argument that statements during prosecution limit all claims to a sensor or signal that is responsive to magnetic fields is a vast oversimplification of the argument between the patent examiner and Stylwan.[70]  In each case, Stylwan was explaining to the examiner that the combination of different technologies for the signals and sensors would not work.  For example, Appx2498 does provide that "[m]agnetics and ultrasonics are two entirely different technologies[]" because the examiner was trying to combine an embodiment of the application with U.S. patent No. 4,522,064.[71]  However, patentee argued that the McMillan reference teaches:

> … ultrasonic calibration signals used to calibrate McMillan do not and cannot tell whether the magnetic saturation in Papadimitriou is complete (see Papadimitriou e.g. Col 7, line 65- Col 8 line 2) Magnetics and ultrasonics are two entirely different technologies.
> Accordingly, to make the proposed modification would apparently involve exchanging the Papadimitriou magnetic sensors for the ultrasonic sensors of McMillan, which are then oriented/spaced as taught by McMillan for calibrations with tubulars, foregoing the orientations/spacing/operation provided by the Papadimitriou magnetic sensors, so that Papadimitriou could then be calibrated with the McMillan system. The proposed modification would change Papadimitriou to effectively be a copy of the McMillan device. Perhaps

---

[69] Appellee's Brief at 29-35.
[70] Appellee's Brief at 29-30.
[71] Appx2498.

this modification is what the Office Action intends. If so, this would change the principle of operation of Papadimitriou.

Although the examiner did not explain how the modification was to be accomplished, another less extensive modification possibility would be to simply add the McMilan calibration system to Papadimitriou without concern that the McMilan calibration signals are meaningless for calibrating the Papadimitriou magnetic sensors. If that is what the examiner intends, then as respectfully as possible, the proposed modification is nonsensical and would apparently result in unexpected or random inaccuracies when calibrating and adjusting the Papadimitriou magnetic sensors system with the McMilan acoustic sensors. If this option is the examiner's proposed modification, then the proposed modification of Papadimitriou by McMilan renders the system unsatisfactory for its intended use of providing reliable magnetic readings in tubulars as required to prevent disasters due to oil related pipes failing.[72]

Reference to the entire argument shows that the patentee was not limiting the claims but rather explaining why the combination proposed by the examiner would not work unless the technologies were the same.   There is no clear disavowal of claim scope.

For Appx2073-Appx2074, SES did not provide the full quote from the prosecution history.  The omitted portion makes clear that the patentee is describing examples of how the claimed invention in the Patents-in-Suit compensate for detriments to the imperfection recognition process to properly scan inspection signals.[73]  There is no disclaimer of either the imperfection recognition process or signal.

---

[72] Appx2498-Appx2499.
[73] Appz2073-Appx2074.

SES's reference to Figure 4 of the '038 application as being similar to Figures from the Patents-in-Suit[74] is merely an example of an embodiment and not a limitation, given the full breadth of the specification.

SES's citation to Hosek is merely another example of patentee responding to the examiner's examples from the Patents-in-Suit.[75]  SES again did not cite the full prosecution statement:

> Hosek does not provide programming to determine a degradation mechanism for a tubular from a plurality of degradation mechanisms for a tubular. In that case, the Hosek modified Papadimitriou system would be unsatisfactory for its intended use of providing reliable magnetic readings in tubulars as required to prevent disasters before the tubulars fail. If this is the examiner's intended modification, then the proposed combination renders the Papadimitriou invention unsatisfactory for its intended purpose.[76]

Stylwan's response was not limiting the invention but rather specifying what the examiner's cited art did not possess.  It is true that Stylwan teaches an example of a system that uses a magnetics, but it also teaches many other inspection systems, as described herein.[77]  There was no disclaimer.

---

[74] Appellee's Brief at 29.

[75] Appellee's Brief at 29-30.

[76] Appx2502.

[77] Appx0032 at 6:28-32; Appx0033 at 7:54-65; Appx0033 at 8:30-43; Appx0055 at 6:21-28; Appx0056 at 7:40-50; Appx0056 at 7:56-66; Appx0056 at 8:14-38; Appx0090 at 12:47-56; Appx0091 at 13:66-14:4; Appx0094 at 19:55-67; Appx0094 at 20:10-28; Appx0094 at 20:30-34; Appx0096 at 24:12-29; Appx0096 at 24:39-43; Appx0106 at 43:7-27; Appx0132 at 4:3-8; Appx0137 at 13:43-53; Appx0139 at 17:30-43; Appx0139 at 18:58-19:18; Appx0142 at 24:33-40;

Lastly, for Hedengren, SES did not provide Stylwan's complete response.  In

that section of the prosecution history, Stylwan was explaining the failures of certain

1-D processing and how its claimed invention overcomes those failures:

> Hedengren discloses how a crack may fool the spacial alignment to
> think that it is a material edge. This, again, is a problem of 1-D
> inspection that relies on one variable, the inspection signal magnitude.
> A crack is the narrowest type of imperfection and the material edge is
> the broadest, a difference of orders of magnitude, but nevertheless, it
> will still confuse 1-D processing. Applicants' system recognizes
> signals, especially signals that are at the ends of the spectrum, such as
> a crack and a material end. Hedengren focuses on magnitude peak
> signals only.[78]

Stylwan was not limiting itself to a particular Signal/Senor combination but rather

explaining how its claimed invention overcomes issues with the prior art.  Stylwan

does discuss specific examples from the specification but did not limit the invention

thereto.

Appellee's Brief repackages its disclaimer argument several times in the

brief.[79] However, none of the repackaging establishes actual disclaimer.  SES's

arguments are the same in each case, but Stylwan was only explaining what the prior

art disclosed.  Stylwan did not disclaim any particular type of signal/sensor

---

Appx0197 at 41:49:65; Appx0231 at 12:55-65; Appx0232 at 13:56-66; Appx0232
at 14:8-13; Appx0235 at 19:4-17; and, Appx0235 at 19:20-31.
[78] Appx2072.
[79] Appellee's Brief at 31-35.

combination. SES has shown no clear disavowal of claim scope and the District Court's construction was in error.

### D. SES's Expert Testimony is Improper to Contradict the Plain Meaning of the Patent Specification

SES's repeated statements that its expert's testimony is that one of ordinary skill would understand that the claimed inventions of the Patents-in-Suit to be limited to magnetic sensors should not impact claim construction[80] as such statements are contrary to well-established case law from this Court:

> Even if these dictionaries, expert testimony, and prior art did establish that video-see-through displays are generally not considered "transparent," it would be of no moment; under *Phillips*, the plain meaning is not the meaning of the term in the abstract but is rather the plain meaning as understood by a POSITA after reading the patents. 415 F.3d at 1313 ("Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification.").[81]

Here, one of ordinary skill, when confronted with the disclosure in the patent, would not find the claims limited as was found by the District Court. SES's expert testimony is of no import for this claim construction.

### IV. THE CLAIMS OF THE PATENTS-IN-SUIT ARE PATENT ELIGIBLE

---

[80] Appellee's Brief at 30; 36-37.

[81] *Sci. Applications Int'l Corp. v. United States*, 154 Fed. Cl. 594, 623 (2021), *reconsideration denied*, 161 Fed. Cl. 373 (2022).

The District Court's Order denying Cross-Appellant's Motion to Dismiss for claiming ineligible subject matter was correct.[82] This was a pleading stage dismissal and that is what SES has appealed.

## A. The District Court was Correct that there are Unresolved factual Issues that Preclude Dismissal

SES sought to dismiss Stylwan's entire case at the pleading stage, but this was not and still is not proper.  While eligibility under Section 101 is ultimately a question of law, "there can be subsidiary fact questions which must be resolved in route to the ultimate legal determination."[83]  For example, the second step of the *Alice* test requires examining  "the elements of the claim to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application."[84]  In turn, this is satisfied when the claim involves "more  than performance of 'well-understood, routine, [and] conventional activities previously known to the industry."[85]  That is a question of fact.[86]  In this case, that fact question cannot be answered adversely to Stylwan based on the complaint and patents alone, as the District Court correctly determined.

---

[82] No document, merely docket entry.

[83] *AAtrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018).

[84] *Id.* (quoting *Alice*, 134 S. Ct. at 2357).

[85] *Id.*

[86] *Id.*

SES's arguments also ask the Court to draw fact inferences against Stylwan at this pleading stage—which is inappropriate.[87]  For instance, the Appellee's brief asserts without support that the coefficients and identifier equations are well-known.[88]  It states that "[t]he Patent claims are not patent eligible under 35 U.S.C. § 101 because they merely seek to automate well-known non-destructive inspection techniques that are performed by humans using well-known mathematical algorithms to observe and identify naturally occurring defects."[89]  However, the language of the specification of the '874 Patent, for example, contradicts this unsupported, non-factual statement:

> Thus, a program has been developed that preferably derives at least one mathematical procedure to enable the computer to automatically recognize the patterns and nuances encompassed in decomposed inspection and/or sound data streams such as presented in the flaw spectrum. The detailed mathematical procedures are described hereinbelow and enable one skilled in the art to implement the AutoRULE described herein without undue experimentation. FIG. 13 illustrates a block diagram of an AutoRULE data processing sequence that allows the creation of a Software flowchart and the translation of the practice to a computer program. For stand-alone operation, the AutoRULE must be optimal in regard to the RULE criteria and application limitations, commonly defined by approximations and probabilities which are referred to herein as constraints. It should be understood therefore, that the AutoRULE state variables must be tuned for optimal performance under different constrains depending on the MUA 9 and its application. The fundamental operation of the AutoRULE is performed by the identifier equations which preferably

---

[87] *Dixon v. C.R. Bard, Inc.*, No.4:19-cv-4037, U.S. Dist. LEXIS 199840 at *4 (S.D. Tex. Jun. 16. 2020).

[88] Appellee's Brief at 4, 25, 51, and 53.

[89] *Id.*

capture the optimal mutual features in accordance to the constraints. It should be understood that a number of identifier equations may be paralleled and/or cascaded, each one utilizing a different set of optimal mutual features. Furthermore, it should be understood that the processing of the identifier equations may be carried out by a single computer or by different computers in a cluster without effecting the overall result.[90]

The same is true for statements SES made about the finite analysis computer software and how it decomposes the converted digital signals.[91] SES's reference to the finite-element analysis engine as a widely commercially available misses the mark because the relevant inquiry is whether the elements individually ***or as an ordered combination*** "transform the nature of the claim" into a patent-eligible application.[92] That question is a fact issue in dispute precluding dismissal at this stage.

Contrary to the arguments in the Appellee's Brief, the claimed inventions lead to a physical work product, such as a report, by virtue of the working of the ordered combination of claimed elements. For example:

> On occasion, it is desirable to analyze the as-is material with FEA to obtain, for example, deflection, strains, stresses, natural frequencies and similar data. Converting manually the AutoFFS signals to a structure requires a number of multidiscipline experts and it is time consuming. Therefore, it is desirable to provide a program that can convert automatically the AutoFFS material features to a geometrical structure for use by a commercially available FEA engine. It should be understood that such conversion would depend on the particular

---

[90] Appx0097 at 25:24-51.
[91] Appellee's Brief at 54-55.
[92] *Alice*, 134 S. Ct. at 2355.

AutoFFS capabilities and the particular FEA engine geometry file specifications. A more general AutoFFS conversion would translate the AutoFFS data to a drawing for use by a commercially available drafting program, such as AutoCAD. Other commercially available programs would then export the drawing data to an FEA engine.[93]

This is also reflected in claims not charted in the complaint, such as independent claim 24 from the '910 Patent:

24. A material evaluation system comprising:

at least one computer;

at least one finite element analysis program;

a material features acquisition system operable to detect at least one material feature in said material under evaluation;

at least one database comprising at least one of material features recognition equations and material historical data;

at least one program being executed on said at least one computer to recognize said at least one material feature and to convert said at least one material feature into a data format for use by said finite element analysis program;

whereby said finite element analysis program being executed on said at least one computer is operable ***to produce a finite element analysis of at least a part of said material***.[94]

As is argued below, the fact that additional independent and dependent claims of the asserted patents include additional elements such as the claimed analysis in claim 24 of the '910 Patent further supports the District Court's denial of SES's motion to dismiss.  Here, while the case was not dismissed at the pleading stage, it was

---

[93] Appx0197 at 41:34-48.
[94] Appx0198 at 44:23-41 (emphasis added).

dismissed by agreement of the parties shortly after claim construction. Therefore, this Court should not decide these factual issues on an incomplete record but rather, if inclined to find the subject matter ineligible on this record, send the case back to complete discovery and the record.

Appellee's Brief misrepresents the Background sections of the asserted patent as admitting that because "there are a plethora of prior art systems that detect, identify, and recognize material defects using a sensor that results in a readout device informing an inspector of a potential defect …"[95] the claims are directed to ineligible subject matter. It is true that "that the industry has utilized a variety of non-destructive inspection techniques over the last 100 years including magnetic flux leakage, magnetic particles, eddy-current, ultrasonic, radiation, dye penetrant, dimensional, visual, and audible."[96] However, it is the ordered combination that renders the claims patent eligible. Further, the Background sections describe the inadequacies of the prior systems and methods—for example:

> However, the limited data 1D-NDI provides for the Material-Under-Inspection (herein after referred to as "MUI") does not adequately address the demanding material application RUL needs. After all, a century ago there was no drilling a 20,000 foot well in 10,000 feet of water in search for hydrocarbons or trains traveling at speeds in excess of 100 miles per hour or supersonic aircraft. For example, when 1D-NDI does not detect any corrosion pitting that exceeds its minimum detection capabilities, it is false to conclude that the material is fit for the application or its RUL satisfies the application needs. It is desirable

---

[95] Appellee's Brief at 53.
[96] Appellee's Brief at 53.

therefore to provide Autonomous RULE (herein after referred to as "AutoRULE") equipment and methods to the industry. AutoRULE must detect and recognize the "as-built" and/or "as-is" MUI features impacting its RULE including, but not limited to, imperfections.[97]

Thus, at a minimum, the plain language of the specification creates a fact issue that precludes an early-stage dismissal, at least prior to the completion of fact discovery.

## B. Claim 1 of Each Patent is Not Representative

Appellee, without explanation, chose claim 1 of each patent as representative. However, "[t]he presence of specific additional limitations in each of the dependent claims confirms that a reliance on a representative claim is not appropriate in this case for the § 101 analysis"[98]

### 1. Claim 1 Of The '320 Patent Is Patent Eligible And Valid

SES incorrectly points to a technological, physical system that performs tasks that a person cannot as "abstract." SES ignores 1) the computer, 2) sensor, and 3) memory storage and ignores that the decomposition process cannot be performed by the human mind. Accordingly, claim 1 of '320 Patent does not preempt any general

---

[97] Appx0085 at 2:10-25.

[98] *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, No. PWG-14-111, 2015 U.S. Dist. LEXIS 62601 at *69 (D. Md. May 12, 2015) *reversed on other grounds* 127 F. Supp. 3d 506 (D. Md. Sept. 2, 2015); *Blackbird Tech LLC v. Advanced Discovery Inc.*, No. 16-413-GMS, 2017 U.S. Dist. LEXIS 98045 at *9 n.1 (D. Del. June 26, 2017) ("Because [plaintiff] properly raised the representative claim issue, the court concludes that [defendant] cannot meet its burden of establishing the § 101 defense with respect to each of the twenty-six dependent claims that were not addressed in the briefing").

idea and satisfies the § 101 test at least for that reason.  SES draws a disputed

conclusion from specification language taken out of context and in isolation.  SES

did not address the specification's definition of "decomposed in frequency" as

"separating desirable characteristics from a frequency response gathered during an

inspection process."[99]  The following description of an embodiment of the signaling

processing of the claimed invention contradicts SES's characterization of the patent

as merely "analyzing information by mathematical algorithms…."[100]:

> Preferably, the inspection head 8 relates time-varying continuous (analog) signals, such as, but not limited to, echo, reluctance, resistance, impedance, absorption, attenuation, or physical parameters that may or may not represent an imperfection of the MUI 9. For MFL inspection, inspection head 8 relates reluctance signals in an analog form. The processing of Eddy-Current amplitude and phase would also result in similar analog signal. It should be appreciated, by those in the art, that sensor 7 signals generally include, but are not limited to, noise and useable data that may indicate some imperfection and/or defect. Further, imperfections generally comprise all received signals and may include MUI 9 design features such as tapers, major and minor defects or other MUI 9 conditions such as surface roughness, hardness changes, composition changes, scale, dirt, and the like. Still further, defects may be viewed as an imperfection of a specific magnitude or beyond a certain threshold. Typically, those in the art have always relied on both an inspector and a manual verification crew for the interpretation of the inspection signals and any subsequent disposition of the MUI 9. However, based on extensive strength-of-materials knowledge, it is well known that the severity of an MUI 9 imperfection is a function of its geometry, its location, and the applied loads. It is also well known, in the art, that this information cannot be readily obtained by a verification crew when the imperfections in question are located underneath coating, in the near subsurface, in the mid wall, or in the

---

[99] Appx0032 at 5:53-55.
[100] Appellee's Brief at 55.

internal surface of the MUI 9. Any destructive action, such as removing any coating or cutting up the MUI 9 is beyond the scope of non-destructive inspection. Detailed signal analysis can extract the pertinent information from the NDI signals. Preferably, such detailed signal analysis would utilize signals that are continuously related in form, kind, space, and time. The analog signals from inspection head 8 are preferably band limited and are then decomposed in frequency. This frequency decomposition can take place in continuous or discrete form. In the continuous form the signals are decomposed through a bank of analog frequency filters and they are then digitized by the computer 10. In the discrete form the signals are digitized by the computer 10 and they are then decomposed through a bank of digital frequency filters or mathematical transforms. Regardless of the frequency decomposition method used, the frequency components of the signals then become the flaw spectrum for use by the AutoNDI in a manner illustrated by element 1 in FIG. 1. It should be understood that computer 10 can manipulate and present the signals in any desirable format. It should be further understood that the signals of geometrically offset sensors, such as the ones shown in FIG. 7 of U.S. Pat. No. 2,881,386, are aligned by computer 10 through time shifting (also known as time delay) primarily controlled by the scanning speed. This may comprise memory, a bucket-brigade, or any combination of the above. Variable length analog delay lines may also be deployed, the delay length controlled primarily by the scanning speed.[101]

At a minimum, this disclosure in the specification creates a fact issue in contrast to the conclusion SES seeks to arrive at, which is not appropriate at this stage. Again, SES reads *Elec. Power Grp.* and *Athena Diagnostics* incorrectly to the extent it argues that they hold that processes that involve the analysis of information by mathematical algorithms cannot be patent eligible. Instead, the binding authority come from *Mayo* and *Alice* which ask:

---

[101] Appx0034 at 9:3-58.

(1) Whether the claim may be distinguished from those that "claim laws of nature, natural phenomena, and abstract ideas," and

(2) If so, "consider the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application."[102]

Thus, SES's attempts throughout their argument regarding the '320 Patent to turn other decisions from this Court into soundbites against the asserted claims should be rejected.

SES's argument regarding claim 1 of the '320 Patent seems to suggest that SES views its subject matter as not novel.[103] But that is not the inquiry.[104] The question at that point is whether the elements, including the physical features of sensor, computer, and memory storage, *in combination with* the programing features to convert the frequency decomposed imperfection signals at a sampling rate controlled by a scanning speed is abstract. SES offers no principled reason why it should be so considered at this early stage when fact issues should be resolved in Stylwan's favor.

## 2. Claim 1 Of The '871 Patent Is Patent Eligible And Valid

---

[102] *Alice*, 134 S. Ct. at 2355.

[103] Appellee's Brief at 55-56 (referring to the argument that frequency decomposition is "nothing new").

[104] *Mayo*, 566 U.S. at 89-90.

SES mischaracterizes *Mayo*, *Elec. Power Grp.*, *Athena*, and *Customedia* when it claims they stand for the proposition that an "inspection system" is "typically held to be an abstract idea."[105] None of those cases reach such a bizarre result. Moreover, this Court's decision in *Genedics*[106] plainly contradicts such a conclusion. As discussed above, the instant case is analogous to *Genedics* where there is enough in the patent to support an inference that the use of the sensor "amounts to something other than the well-understood, routine, or conventional use of sensor technology."[107] Here, the claim requires the physical components of (1) a sensor, (2) a bank of programmable filters arranged in parallel, (3) filter outputs, (4) a processor, and (5) a memory storage.[108] It also requires programming to detect certain imperfections, which, according to the description given in the specification, cannot be accomplished in the abstract or by the human mind. For example:

> The low frequency components are extracted by the low-pass filter 150. It should be understood that the term low-frequency features are not in absolute terms but in relative terms to the scanning speed. Therefore, the cutoff frequency of the low-pass filter 150, denoted as Fc in FIGS. 6A-6C, may be set to 5 Hz for one scanning speed and to 50 Hz for a higher scanning speed. The exact cutoff frequency of the low-pass filter 150 depends on the sensor information 5, the instantaneous scanning speed derived by the computer 10 from sensor 24, and the specific MUI 9. FIGS. 6A-6C illustrates a programmable 3.sup.rd order low-pass analog filter and its design equations for clarity. Low-pass filters are

---

[105] Appellee's Brief at 57-58.

[106] *Genedics, LLC v. Meta Co.*, No. 17-1062-CJB, 2018 U.S. Dist. LEXIS 7845 at *28-31 (D. Del. Jan. 8, 2018).

[107] *Id.* at *30.

[108] Appx0062 at claim 1.

well known in the art and their design can be found throughout the literature. Filter design software, some available free of charge, is also available from multiple component vendors such as, MicroChip, Linear Technology, and many others. The low-pass filter of FIGS. 6A-6C includes of two sections. A 1.sup.st order filter comprising of resistor 151 and capacitor 152 cascaded with a 2.sup.nd order low-pass analog filter. It should be understood that all other filter orders can be obtained by cascading additional filter sections. Preferably, the variable resistors 151 and 153 are digitally controlled potentiometers such as the ones offered by XICOR and a fixed resistor value (not shown) similar to the FIGS. 5A-5D network 142 and 143. Computer 10 may vary the variable resistor 151 and 153 value thus adjusting the cutoff frequency of the low-pass filter.[109]

SES's argument regarding step 2 of the *Mayo/Alice* test for claim 1 of the '871 Patent is unsupported and conclusory. It ignores the physical components recited in the claim and does not apply the required analysis of the elements individually or in an ordered combination. It is simply insufficient to establish ineligibility by clear and convincing evidence at this stage when fact issues should be resolved in Stylwan's favor.[110]

### 3. Claim 1 of the '874 Patent Is Patent Eligible And Valid

SES incorrectly categorizes claim 1 as "directed to a system for detecting and evaluating information." First, as explained above, this improperly deals with the claimed subject matter at the highest level of abstraction.[111] Second, it ignores the

---

[109] Appx0061 at 17:27-52.

[110] *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1369 (Fed. Cir. 2018) (underlying fact issues preclude summary judgment on ineligibility under § 101).

[111] *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337 (Fed. Cir. 2016).

elements in the claim language that recite technological, physical components and that cannot be performed by the human mind. *Magna Electronics* is instructive.[112] In *Magna Electronics*, the claim led to the result of "detect[ing] a headlamp of a vehicle in the [driver's] field of view."[113] Were SES correct that "systems for detecting and evaluating information" were *per se* ineligible, then the court in *Magna Electronics* should have so held. But, it did not. Instead, the court reasoned that the claim specified a specific "sensor configuration and a particular approach of using data acquired from the sensor."[114] That is the case here. The court in *Magna Electronics* based its decision primarily on this Court's decision in *Thales Visionix*, where the claim at issue was directed to "tracking the motion of an object relative to a moving reference frame" using two sensors.[115] Like the instant claim that requires "equations and coefficients," the claim in *Thales* involved a "configur[ation] to determine" the information sought.[116] Like the instant claim, no specific algorithm or method of calculation was recited in the *Thales Visionix* claim.[117] The courts in *Magna Electronics* and *Thales Visionix* concluded that the claim passed step one of

---

[112] *Magna Elecs., Inc. v. Valeo, Inc.*, No. 13-11376, 2017 U.S. Dist. LEXIS at *23-24 (E.D. Mich. Apr. 10, 2017).
[113] *Id.*
[114] *Id.* at *29.
[115] *Id.* at *26 citing *Thales Visionix, Inc. v. United States*, 850 F.3d 1343 (Fed. Cir. 2017).
[116] *Id.* at 1345.
[117] *Id.*

the *Alice/Mayo* test, and claim 1 here should pass step one as well for the same reasons. The claimed invention as a whole recites technological, patentable subject matter, and helps overcome technological problems associated with material feature evaluation as described throughout the specification. Accordingly, claim 1 is not directed to abstract subject matter.

That conclusion should end the inquiry.[118] Particularly here at this early stage, it is premature to resolve inferences against Stylwan, the non-movant, as discovery is still ongoing. Nonetheless, to the extent the Court wishes to consider step two of the *Alice/Mayo* test as applied to claim 1 of the '874 Patent, that claim identifies an "inventive concept" in the application of its subject matter.

SES incorrectly alleges that claim 1 fails to provide technical details, invoking *TLI Commc'ns*.[119] But that is demonstrably false as claim 1 recites, among other things, 1) a computer, 2) a material features acquisition system, 3) signals, 4) material features, 5) identifier equations and coefficients, and 6) a database.[120] All are technological and cannot be substituted by ordinary mental processes.[121] SES's

---

[118] *Rapid Litig. Mgmt. v. CellzDirect, Inc.*, 827 F.3d 1042, 1047 (Fed. Cir. 2016) ("Step one asks whether the claim is 'directed to one of [the] patent-ineligible concepts.' If the answer is no, the inquiry is over: the claim falls within the ambit of § 101.")

[119] Appx0502 citing *TLI Communs. LLC v.AV Auto., L.L.C.*, 823 F.3d 607, 612-13 (Fed. Cir. 2016).

[120] Appx0106 at Claim 1.

[121] *Magna*, 2017 U.S. Dist. LEXIS 77326 at *40-41 (finding eligible subject matter because *inter alia* humans could not perform the claim in their minds).

complaints about how the elements of claim 1 are connected do not bear on eligibility at this stage, before discovery is complete.[122]  In short, at a minimum when considering this record at this early stage, claim 1 of the '874 Patent identifies an "inventive concept" and claims patent eligible subject matter.

### 4.  Claim 37 Of The '425 Patent Is Patent Eligible And Valid

SES incorrectly provides that Claim 1 is representative.  However, the elements of claim 37 render it representative.  In its original briefing, SES incorrectly characterizes claim 37 as having "only two components."[123]  This plainly ignores the claim language that recites the following components (in **bold**):

37. A **material evaluation system** comprising: at least one **computer**;

> a **material features acquisition system** operable to detect a plurality of material features in a material under evaluation;

> at least one **database** comprising at least one of material features recognition equations and **material historical data**;

> at least one **program** being executed on said at least one computer to recognize said plurality of material features and to convert said plurality of material features into a data format for use by a **finite element analysis program**;

> whereby said at least one program further comprises said finite element analysis program, said finite element analysis program being executed on by said at least one computer to make a

---

[122] *AAtrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018).
[123] Appx0504.

> determination of whether said material is fit for use for a service
> or should be removed from use in said service.[124]

Like the discussion for the '874 Patent, disclosure of a specific algorithm is not

necessary.[125]   However, algorithms are disclosed at least as described above.[126]

Instead, the specification makes clear that:

> AutoFFS "knows by some detail" the imperfection and "connects and
> associates" the imperfection with known imperfection definitions.
> AutoFFS preferably uses fitness for service formulas and knowledge
> and is preferably able to export a file for use by an FEA engine because
> AutoFFS "knows by some detail" the material features. It should be
> understood that different FEA engines use different structure geometry
> import/export specifications.[127]

Thus, SES's complaint that "the Claim fails to recite code or algorithms the

computer uses, and they are not explained in the '874 Patent" is not well made.  The

*Ericsson* case involved claims that "require[d] nothing more than [the] abstract idea

of [controlling access to, or limiting permission to, resources."[128]   Here, there are

specific technological components and programming needs that cannot be met by

the human mind, so *Ericsson* does not apply:

> On occasion, it is desirable to analyze the as-is material with FEA to
> obtain, for example, deflection, strains, stresses, natural frequencies
> and similar data. Converting manually the 20 AutoFFS signals to a
> structure requires a number of multidiscipline experts and it is time

---

[124] Appx0153 at claim 37.

[125] *Thales Visionix, Inc. v. United States*, 850 F.3d 1343, 1345 (Fed. Cir. 2017)

[126] Appx0097 at 25:24-51.

[127] Appx0132 at 3:25-30.

[128] *Ericsson Inc. v. TCL Commun. Tech. Holdings Ltd.*, 955 F.3d 1317, 1326 (Fed. Cir.2020).

consuming. Therefore, it is desirable to provide a program that can convert automatically the AutoFFS material features to a geometrical structure for use by a commercially available FEA engine. It should be 25 understood that such conversion would depend on the particular AutoFFS capabilities and the particular FEA engine geometry file specifications. A more general AutoFFS conversion would translate theAutoFFS data to a drawing for use by a commercially available drafting program, such as 30 AutoCAD. Other commercially available programs would then export the drawing data to an FEA engine.[129]

As mentioned above, SES's cited case *Elec. Power Grp.* Dealt with claims to "merely selecting information . . . for collection" and did "nothing significant to differentiate a process from ordinary mental processes."[130]  That is not the case here where the technological device at issue comprises physical components for performing tasks that cannot be done merely by the human mind.

Just as *Intellectual Ventures* did not apply to claim 1 of the '910 Patent, so too does it not here.  The court there found the claimed subject matter to be abstract because it was directed to the fundamental, non-technological, practice of looking at mail and discarding certain letters, without opening them, based on their perceived sources."[131]  Here, the specification explicitly describes the examination of materials by eye versus by the claimed technology and the advantages of the later as well as why it cannot be done by eye:

---

[129] Appx0151 at 41:18-49.
[130] *Elec. Power Group, LLC*, 830 F.3d at 1742.
[131] *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1313 (Fed. Cir. 2016).

By now, it should be easy to recognize the calibration notches 6C. However, those notches were machined on new defect-free material and they meet strict geometry standards, as it is further shown in FIG. 16C. Therefore, their flaw spectrum signature is extremely simple and easily recognizable. On the other hand, imperfections in nature are mostly found on used material, they are rarely alone, they are multifaceted and give rise to complex flaw spectrums that are not always easily recognizable. Furthermore, a key weaknesses of any manual process, such as the manual verification, is the uncontrollable "human factors". If imperfection 6A was found instead on heavily used material along with other imperfections, would a trained inspector always distinguish it in the resulting flaw spectrum clutter? It is the aim of this invention to answer this question with confidence by providing a computer, a sensor interface and a program to scan the sensor signals for patterns to recognize material features, including but not limited to imperfections. Again, features recognition demands that the frequency spectrum of the sensor signals that include non-redundant information spanning from fatigue to wall thickness is preserved and normalized.[132]

Further,

It is also well known, in the art, that this information cannot be readily obtained by a verification crew when the imperfections in question are located underneath coating, in the near subsurface, in the mid wall, or in the internal surface of the MUI **1.** Any destructive action, such as removing any coating or cutting up the MUI **1** is beyond the scope of non-destructive inspection.[133]

Therefore, the specification makes it clear that these processes could not be performed by a human. As such, the claimed subject matter here is not abstract and is patent eligible. *Athena Diagnostics* and *Customedia*, cited by SES do not apply

---

[132] Appx0136 at 12:14-34.
[133] Appx0140 at 20:46-52.

either.[134] *Athena Diagnostics* dealt with the discovery and application of a law of nature—not remotely at issue here.[135] *Customedia Techs.* involved the use of a computer as a mere tool for delivering advertising.[136] On the other hand, the '425 Patent involves technological components in an ordered combination to analyze material features using certain programing to determine fitness for service. Thus, *Customedia* is inapt.

For all of the above reasons, claim 37 of the '425 is not abstract and it is valid and patent eligible.

### 5. Claim 41 of the '910 Patent Is Patent Eligible And Valid

Claim 24 of the '910 patent is not representative. Rather, claim 41 is properly representative, as was alleged in the prior briefing.[137] *Intellectual Ventures*, relied on by SES, is inapt. There the claims were directed to "filtering e-mails that have unwanted content."[138] The court found this subject matter to be abstract because it was directed to a fundamental, non-technological, practice.[139] Specifically, the court

---

[134] Appellee's Brief at 62; citing *Athena Diagnostics, Inc. v. May Collaborative Servs., LLC*, 915 F.3d 743, 750-51 (Fed. Cir. 2019) and *Customedia Techs.* involved the use of a computer as a mere tool for delivering advertising.[134]

[135] *Athena Diagnostics*, 915 F.3d at 750-51.

[136] *Customedia Techs., LLC v. Dish Network Corp.*, 951 F.3d 1359, 1362-63 (Fed. Cir. 2020)

[137] Appx0498-Appx0500.

[138] *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1313 (Fed. Cir. 2016).

[139] *Id.*

noted that there was a long-prevalent practice for people receiving paper mail to look at an envelope and discard certain letters, without opening them, from sources from which they did not wish to receive mail based on characteristics of the mail."[140]

Here, however, the '910 specification explicitly describes the invention as going beyond prior testing methods, whether manual or by prior technologies.  For instance:

> The MFL principle of operation is eloquently described in U.S. Pat. No. 2,194,229: "It is old in the art to test magnetic material for flaws by passing therethrough a magnetic flux, providing means responsive to variations in the flux, and thereby locating regions of abnormal magnetic reluctance"; and herein lies the problem that has plagued the 1D-NDI all along. 1D-EMI units flag " . . . regions of abnormal magnetic reluctance" in ferromagnetic materials and UT units flag regions of echoes. They do not identify the material features; they do not detect the failure-potential of any feature, including but not limited to imperfection, and most importantly, they do not assess the material fitness for service under the application constraints.
>
> . . . .
>
> If imperfection 6A was found instead on heavily used material along with other imperfections, would a trained inspector always distinguish it in the resulting flaw spectrum clutter? It is the aim of this invention to answer this question with confidence by providing a computer, a sensor interface and a program to scan the sensor signals for patterns to recognize material features, including but not limited to imperfections. Again, features recognition demands that the frequency spectrum of the sensor signals that include non-redundant information spanning from fatigue to wall thickness is preserved and normalized.

---

[140]     *Intellectual Ventures I LLC*, 838 F.3d at 1313.

Once the parties proceed further with discovery as set out in the district court's Local Patent Rules and Scheduling Order, the parties will have an opportunity to present their underlying facts, including intrinsic and extrinsic evidence, supporting those positions. As this time, the district court would have an additional opportunity to address the specification evidence, for example, cited above that contradicts SES's abstract subject matter arguments made here.

Unlike the limitations of the claim at issue in *Intellectual Ventures*, claim 41 of the '910 Patent requires physical, technological components to operate and not merely a generic computer programmed for a task. For instance, it requires a material to evaluate, a sensor that provides an output for detection, the output must be in signals with time-varying electrical form, a computer, and technological means in the computer for calculating a geometry of a material feature. Those features distinguish claim 41 from the programmed-generic-computer claim of *Intellectual Ventures*. None of the cases cited in *Intellectual Ventures* involve such a situation.[141] Moreover, the cases cited in SES's other case, *Electric Power Group*, according to the opinion itself, did not involve a situation where a "particular tool" was involved.[142] Here, as explained above, specific physical, technological tools are used and recited in the claim. Hence, claim 41 passes the first step of the *Mayo/Alice*

---

[141] *Intellectual Ventures*, 838 F.3d at 1314 n.5 (collecting cases).
[142] *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016).

test, and, accordingly, the patent eligibility inquiry should end there.[143] On the other hand, SES's analysis suffers from the flaw that it does not analyze the claim as a whole—instead it addresses individual limitations standing alone.[144] The United States Supreme Court has cautioned that overgeneralizing claims, "if carried to its extreme, make[s] all inventions unpatentable because all inventions can be reduced to underlying principles of nature which, once known, make their implementation obvious."[145] But that is precisely what SES improperly urges.

Regarding the second *Mayo/Alice* step, SES simply mischaracterizes the claim by ignoring the bulk of the limitations in the claim language. This runs afoul of the step two test: "consider the elements of each claim both individually and '***as an ordered combination***' to determine whether the additional elements 'transform the nature of the claim' into a patent eligible application."[146] For instance, contrary to SES's statement, the first step of claim 41 is not "examining a 'material,'" but rather "detecting an output of at least one sensor, said output comprising of signals indicative of features from the material under evaluation, in a time-varying electrical

---

[143] *Rapid Litig. Mgmt. v. CellzDirect, Inc.*, 827 F.3d 1042, 1047 (Fed. Cir. 2016) ("Step one asks whether the claim is 'directed to one of [the] patent-ineligible concepts.' If the answer is no, the inquiry is over: the claim falls within the ambit of § 101.")

[144] *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337 (Fed. Cir. 2016) ("describe[es] the claims at such a high level of abstraction and untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule.")

[145] *Id*. (quoting *Diamond v. Diehr*, 450 U.S. 175, 189 n.12 (1981)).

[146] *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014).

form." Like the case in *Genedics*,[147] *LLC v. Meta Co.*, there is enough in the patent to support an inference that the use of the sensor "amounts to something other than the well-understood, routine, or conventional use of sensor technology."[148] That is all that is required at this early stage, when discovery is not complete.[149] Certainly, any fact disputes regarding the conventional or non-conventional nature of this feature should be resolved in favor of Stylwan, the non-movant, at this stage.[150]

Regarding the other steps of the claim, again SES's approach does not consider their elements in an ordered combination and, thus, improperly applies the *Alice/Mayo* test. For example, although the claims in *DDR Holdings* involved the use of a computer, those functions were focused on a particular challenge[151] —just as claim 41 is directed to a particular challenge of evaluating material features. Just as the court in *DDR Holdings* determined that "when the claim limitations were taken together as an ordered combination, they recited an invention that was not merely "the routine or conventional use of the Internet,"[152] the Court here should recognize that the limitations of claim 41 taken together as an ordered combination recite an invention that is not merely the routine or conventional use of a computer.

---

[147] *Genedics, LLC v. Meta Co.*, No. 17-1062-CJB, 2018 U.S. Dist. LEXIS 7845 at *28-31 (D. Del. Jan. 8, 2018).
[148] *Id*. at *30.
[149] *Id*. at *33 (denying motion to dismiss).
[150] *Id*. *30-31.
[151] *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014).
[152] *Id*. at 1259.

SES's other cited cases are not analogous. *Electrical Power Group*, that involved "merely selecting information . . . for collection" and did "nothing significant to differentiate a process from ordinary mental processes."[153]  Here, however, claim 41 requires "detecting an output of at least one sensor" where the output comprises "signals indicative" and in a "time-varying electrical form" which are not well-known and conventional nor ordinary mental processes.  Further,

> It is also well known, in the art, that this information cannot be readily obtained by a verification crew when the imperfections in question are located underneath coating, in the near subsurface, in the mid wall, or in the internal surface of the MUI **1.** Any destructive action, such as removing any coating or cutting up the MUI **1** is beyond the scope of non-destructive inspection.[154]

This excerpt of language is also found in the '894 patent.[155]  Therefore, the specification of the Patents-in-Suit make it clear that these processes could not be performed by a human.  Thus, *Electrical Power Group* does not apply.  Also, *Customedia Techs.* involved the use of a computer as a mere tool for delivering advertising.[156]  But, claim 41 includes a computer as part of an ordered combination like that in *BASCOM* where, at a minimum, the claims provided an ordered combination for a "specific discrete implementation of the abstract idea of filtering

---

[153] *Elec. Power Group, LLC*, 830 F.3d at 1742.

[154] Appx0186 at 20:60-64.

[155] Appx0235 at 20:61-67.

[156] *Customedia Techs., LLC v. Dish Network Corp.*, 951 F.3d 1359, 1362-63 (Fed. Cir. 2020)

content."[157]  Here, the inventive concept rests on the advantage of harnessing the technological sensor configuration with a computer to evaluate material features and calculate their geometries.  The claim does not preempt all ways of using sensors or computers with materials or all ways of calculating geometries of material features. When there are disputed fact issues on whether a claim preempts an underlying idea, there are material issues of fact as to whether a claim is abstract precluding dismissal at the early stage.[158]  Rather than preempt, the claim recites a specific ordered combination that is inventive, not well-understood, and non-conventional.  Hence, it is patent eligible.

### 6. Claim 1 Of The '894 Patent Is Patent Eligible And Valid

SES improperly describes the subject matter of claim 1 at an overly high level of abstraction[159] as "[a] computer is used to evaluate the output of scanning sensors."[160]  In fact, the claim recites a multi-step process using technological components of 1) a computer, 2) a material features acquisition system for scanning a material under evaluation, 3) at least one sensor, and 4) programming to determine

---

[157] *BASCOM Global Internate Servs. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016).

[158] *Cap-XX, Ltd. v. Ioxus, Inc.*, No. 18-849-CFC, 2020 U.S. Dist. LEXIS 35282 at *8-9 (D. Del. Mar. 2, 2020).

[159] *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337 (Fed. Cir. 2016); *TLI Commc'ns*, 823 F.3d at 611 (courts "must be careful to avoid oversimplifying the claims" by looking at them generally and failing to account for the specific requirements of the claims).

[160] Appellee's Brief at 66.

a degradation mechanism including the use of a calibration step.[161]  But, SES ignores those technological aspects of the claim in arriving at the conclusion—which improperly requires all inferences to be drawn in SES's favor—that it claims the automated process of a human looking at a material feature and asking does that look like a defect I've seen before.[162]  The technological elements recited above are not present in some hypothetical process performed by the human mind.  Even taking the claim at this improperly generalized level of abstraction, "processes that automate tasks that humans are capable of are patent eligible if properly claimed."[163]

In *McRO, Inc. v. Bandai Namco Games Am. Inc.*, the claim at issue was:

A method for automatically animating lip synchronization and facial expression of three-dimensional characters comprising:
   obtaining a first set of rules that define output morph weight set stream as a function of phoneme sequence and time of said phoneme sequence;
   obtaining a timed data file of phonemes having a plurality of sub-sequences;
   generating an intermediate stream of output morph weight sets and a plurality of transition parameters between two adjacent morph weight sets by evaluating said plurality of sub-sequences against said first set of rules;
   generating a final stream of output morph weight sets at a desired frame rate from said intermediate stream of output morph weight sets and said plurality of transition parameters; and

---

[161] Appx0247 at claim 1.
[162] Appellee's Brief at 66-67.
[163] *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1313 (Fed. Cir. 2016).

applying said final stream of output morph weight sets to a sequence
of animated characters to produce lip synchronization and facial
expression control of said animated characters.[164]

The general technology area for the patent was automating part of a preexisting 3-D

animation method, particularly an animated character's face.[165]  There the accused

infringer challenged the claim with an argument similar to that made by SES here—

that "the claims remain directed to an abstract idea because they only require using

'mathematical algorithms to manipulate existing information to generate additional

information."[166]  The court in *McRO*, however, noted that courts should "be careful

to avoid oversimplifying the claims by looking at them generally and failing to

account for the specific requirements of the claims."[167]  Just as the claims in *McRO*

"set out meaningful requirements" for the recited sets of rules applied, here the claim

sets out meaningful requirements for the programing applied to arrive a possible

degradation mechanisms, namely using previously detected material features and a

calibration step.[168]  Thus, claim 1 is not abstract.

As for the calibration step itself, the specification describes calibration

samples for use with the invention in Figures 16-A and 16-B:

---

[164]    *McRO, Inc.*, 837 F.3d at 1307-08.

[165]    *Id*. at 1303.

[166]    *Compare id*. at 1310 *with* Dkt. No. 22 at 19 ("Analyzing information by steps
people go through in their minds or by mathematical algorithms is an abstract idea.").

[167]    *Id*. at 1313.

[168]    *Compare id*. at 1313 with Appx0247 at claim 1.

FIG. 16A illustrates a calibration sample with four features for use with AutoRULE to evaluate the AutoRULE feature identification capabilities and tune its parameters for the specific RULE needs of the particular material/application. Imperfection 156A is a crack-like imperfection, 156B is a pit-like imperfection, 156C is a gouge-like imperfection and 156D is a wall thickness feature. It should be understood that the calibration sample may contain multiple features and/or multiple examples of similar features with varying geometries. It should further be understood that features may be located on the OD or the ID of the material or both the OD and ID.

FIG. 16B illustrates a calibration sample with two coexisting imperfections for use with AutoRULE to evaluate the AutoRULE coexisting imperfection separation and identification capabilities and tune its parameters for the specific RULE needs of the particular material/application. Imperfection 157 is a crack-like imperfection coexisting with a pit-like imperfection. It should be understood that the calibration sample may contain multiple coexisting features and/or multiple examples of similar coexisting features with varying geometries. It should further be understood that coexisting features may be located on the OD or the ID of the material or both the OD and ID.[169]

The specification states that, as opposed to the prior and flawed 1D-NDI imperfection evaluation method, the invention would use a more advanced method such AutoRULE:

> On the other hand, AutoRULE would evaluate each 159 imperfection on its own and apply neighborhood correction factors, thus distinguishing imperfection 159 from 158.[170]

---

[169] Appx0243 at 38:24-27; Appx0221 at Figs. 16-A and 16-B.
[170] Appx0245 at 39:16-18.

As for how the example of AutoRULE itself works, that is explained in detail throughout the specification, particularly in connection with Figure 13 and the accompanying text at columns 25-31.  For example:

> FIG. 13 illustrates a block diagram of an AutoRULE data processing sequence that allows the creation of a software flowchart and the translation of the practice to a computer program. For stand-alone operation, the AutoRULE must be optimal in regard to the RULE criteria and application limitations, commonly defined by approximations and probabilities which are referred to herein as constraints. It should be understood therefore, that the AutoRULE state variables must be tuned for optimal performance under different constrains depending on the MUA 9 and its application. The fundamental operation of the AutoRULE is performed by the identifier equations which preferably capture the optimal mutual features in accordance to the constraints. It should be understood that a number of identifier equations may be paralleled and/or cascaded, each one utilizing a different set of optimal mutual features. Furthermore, it should be understood that the processing of the identifier equations may be carried out by a single computer 20 or by different computers in a cluster without effecting the overall result.[171]

Thus, the disclosure of the calibration step teaches use—but is not limited to—of the AutoRULE method.  And, the AutoRULE method is described in detail throughout the specification.  Hence, SES is wrong to assert that "[h]ow the AutoRULE alleged inventions performs calibration is never disclosed" and that the calibration is "merely automation of human activity."[172]

---

[171] Appx0238 at 25:43-61 and Fig. 13.
[172] Appellee's Brief at 68-69.

At a minimum, there are disputed fact issues regarding whether the claims of the Patents-in-Suit involve more than the performance of well-understood, routine, and conventional activities previously known to the industry.  As such, resolution against the non-movant, Stylwan, is inappropriate at this pleading stage.[173]

### (3) Alternatively, Stylwan Should Be Permitted To Amend Its Complaint With Additional Claims

In the event that the Court determines that the District Court was incorrect and one or more claims is not patent eligible, Stylwan respectfully asks that it be permitted to amend its complaint to specifically recite infringement of additional claims of the patents-in-suit.  As just an example:

| Patent | Claim | Additional technological features |
|--------|-------|-----------------------------------|
| '320 | 2 | Further comprising the induction of an excitation into a material and detecting the response to the excitation through said at lease one imperfection detection sensor. |
| '871 | 2 | wherein at least one of said plurality of programmable filters is a low pass filter wherein at least one of said plurality of filter outputs comprises a DC frequency component of said imperfection signal. |
| '874 | 9 | wherein said material features acquisition system is operable for at least one of induction of an excitation bias and induction of an excitation into said material under evaluation and detecting a material under evaluation response to the excitation through said sensor. |

---

[173] *AAtrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018).

| '425 | 38 | further comprising: at least one sensor with an output, said output comprising of signals indicative of plurality of features from the material under evaluation, in a time-varying electrical form; a sensor interface for said at least one computer, wherein said output is in communication with said at least one computer and wherein said at least one computer converts said signals to a digital format, producing digital signals; said at least one database further comprising at least one of material features recognition equations and said material historical data; a memory storage for said at least one computer, wherein said at least one database and said digital signals can be stored; and said at least one program being executed on said at least one computer, said at least one computer is being guided by said at least one database to utilize said digital signals for identifying said plurality of material features detected by said at least one sensor. |
|---|---|---|
| '910 | 1 | 1. A method to evaluate material comprising: inducing excitation into said material; detecting an output of at least one sensor, said output comprising of signals indicative of features from the material under evaluation, in a time-varying electrical form; decomposing in frequency said signals, wherein said decomposing comprises passing said signals through at least one filter, producing decomposed in frequency signals; converting said decomposed in frequency signals to a digital format producing digital signals; recognizing a feature by utilizing a computer to analyze said digital signals; evaluating an impact of said material feature upon said material under evaluation, utilizing said computer; and calculating a fitness for service of said material under evaluation, utilizing said computer. |
| '894 | 9 | further comprising of inducing excitation into said material under evaluation. |

These additional limitations increase the technological and non-abstract nature of the claimed inventions.  If this Court finds one or more of the claim directed to patent ineligible subject matter, Stylwan should be allowed to amend.

## CONCLUSION AND RELIEF SOUGHT

Appellants Stylwan IP Holding, LLC and Stylwan IIT, LLC respectfully requests this Court modify the District Court's construction as set for the herein and affirm the denial of SES's Motion to Dismiss.

Date:  December 20, 2023                      Respectfully submitted,

**Ramey LLP**

/s/ William P. Ramey, III
William P. Ramey, III
Texas State Bar No. 24027643
5020 Montrose Blvd., Suite 800
Houston, Texas 77006
713-426-3923 (Telephone)
832-900-4941 (Facsimile)

**ATTORNEYS FOR STYLWAN IP
HOLDING, LLC AND
STYLWAN IIT, LLC**

## <u>CERTIFICATE OF SERVICE</u>

I certify that I served a copy on counsel of record on December 20, 2023, by

electronic means (by email or CM/ECF).

/s/ William P. Ramey, III
William P. Ramey, III
Ramey LLP
Texas State Bar No. 23027643
5020 Montrose Blvd., Suite 800
Houston, Texas 77006
(713) 426-3923 (Telephone)
(832) 900-4941 (Facsimile)
wramey@rameyfirm.com


**ATTORNEYS FOR STYLWAN IP
HOLDING, LLC AND STYLWAN IIT,
LLC**

## <u>CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)(B)</u>

The undersigned counsel of records for STYLWAN IP HOLDING, LLC

AND STYLWAN IIT, LLC, certifies that this Principal Brief of Appellants complies

with the typeface requirement provided in Rule 32(a)(5) and type-volume limitation

provided in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.   In

preparing this certificate, I relied on word-count program of Microsoft Word 2010.

This Brief contains 12,780 words.


Dated:         December 20, 2023          /s/ William P. Ramey, III
                                          William P. Ramey, III
                                          Ramey LLP
                                          Texas State Bar No. 23027643
                                          5020 Montrose Blvd., Suite 800
                                          Houston, Texas 77006
                                          (713) 426-3923 (Telephone)
                                          (832) 900-4941 (Facsimile)
                                          wramey@rameyfirm.com